# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

_____

RICKEY L. TOLBERT,

                         Plaintiff,

vs.

RICHARD SMITH and
ROCHESTER CITY SCHOOL DISTRICT,

                         Defendants.

_____

                  DECISION & ORDER
                  09-CV-6579 CJS

## APPEARANCES

For plaintiff:                    David Rothenberg, Esq.
                                    Geiger and Rothenberg, LLP
                                    45 Exchange Street, Suite 800
                                    Rochester, NY 14614

For defendants:              Michael E. Davis, Esq.
                                    Rochester City School District
                                    Department of Law
                                    131 West Broad Street
                                    Rochester, NY 14614

## INTRODUCTION

**Siragusa, J.** Plaintiff Rickey Tolbert ("Plaintiff") commenced this lawsuit against Defendants Richard Smith ("Smith") and the Rochester City School District ("the District"), (collectively referred to herein as "Defendants"). In that regard, he alleges that Defendants intentionally discriminated against him on the basis of his race, created a hostile work environment, and committed defamation in connection with his employment as a culinary arts teacher at John Marshall High School ("Marshall") in Rochester, New York. Plaintiff brings his five claims pursuant to 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964 ("Title VII"), New York Human Rights Law ("NYHRL"), and New York common law. Am. Compl. ¶¶ 40-71, Feb. 11, 2010, ECF No. 10.

Presently before the Court is Defendants' motion for summary judgment, filed on December 15, 2011, ECF No. 18. For the reasons that follow, Defendants' motion is granted, and the amended complaint is dismissed in its entirety.

## BACKGROUND

The following are the undisputed facts of this case, viewed in the light most favorable to Plaintiff as the non-moving party.

### *John Marshall High School, 2006–2009*

Plaintiff is an African-American male who graduated from the Culinary Institute of America in 1981. In September, 2006, the District hired Plaintiff to teach culinary arts at John Marshall High School ("Marshall"). The culinary arts facility at Marshall consisted of a two-sided room with one-half being a traditional classroom and the other half set up as a restaurant/kitchen. Defendants contend that the entire facility was referred to as the "Jurist Café," or the "Jurist Room." However, Plaintiff states that the Jurist Café was also the name of a project planned by the culinary arts program and the Maplewood Neighborhood Association. Tolbert Dep. (Def. Ex. 21) at 39, 42–43, Dec. 14, 2010, ECF No. 18-4; William Lilly & Mike Coniff ltr to Jean-Claude Brizzard, Jun. 4, 2009, ECF No. 21-2 (Pl. Ex. 7) at 1.

When Plaintiff started at Marshall in the 2006–2007 school year, his supervisor was Principal Joseph Munno ("Munno"). Laurel Avery-DeToy ("Avery-DeToy"), Academy Director,[1] began working at Marshall during Plaintiff's second year at the school, in 2007–2008. Avery-DeToy conducted formal teacher observations ("FTOs") of Plaintiff during the 2007–2008 school year.

---

[1] "The teachers at Marshall were supervised by one of two Academy Directors: Susan Hart or Laurel Avery-DeToy." Smith Decl. ¶ 32, Dec. 15, 2011, ECF No. 18-1.

Munno retired mid-year in November, 2007, and two acting Principals were successively assigned to complete the 2007–2008 school year at Marshall. Smith then became Principal at Marshall during the 2008–2009 school year. When Smith accepted the assignment, Marshall had a record of poor performance. The New York State Department of Education had designated Marshall as a school in need of improvement—to raise graduation rates and student achievement in the areas of language arts and mathematics. According to Smith, unless the school improved, it was at risk of being shut down by the State. Plaintiff denies this characterization, claiming that Marshall was ranked poorly only in one area. Smith Decl. ¶ 5, Dec. 12, 2011, ECF No. 18-1; Munno Dep. at 48, Feb. 14, 2012, ECF No. 21-1. Marshall, as well as all schools in the District, faced budget cuts for the 2008–2009 school year. Plaintiff testified that he was aware of the educational shortcomings at Marshall and heard that the school was scheduled to be closed. Tolbert Dep. at 362.

During the 2008–2009 school year, there were changes in the class sizes and student assignments for the culinary arts program. According to Defendants, those changes were dictated by Marshall counselors and the school's Registrar to meet the needs of the students and the school. Smith Decl. ¶¶ 14-15. Plaintiff, on the other hand, testified that Smith oversaw everything at Marshall, and that it is impossible that Smith was not involved in the class size and student assignments for culinary arts. *See* Tolbert Dep. at 261, 346–47, Feb. 14, 2012, ECF No. 21-1 (Smith oversaw the breakfast menu, including whether grits or home fries were served). After Plaintiff raised the issue of the culinary arts class sizes being too large, changes were made and students were trans-

ferred out of his classes so that the class sizes conformed to the collective bargaining agreement limit of twenty-four students per class. Plaintiff goes on to state that during 2008–2009, his class sizes were never as small as they were in previous years. Formal Teacher Observation forms, Nov. 14, 2007, Feb. 8, 2008 & Feb. 27, 2008 (Pl. Exs. 64, 67, 68), Feb. 14, 2012, ECF No. 21-2.

Also in 2008–2009, a "paraprofessional" or teacher aide position was eliminated from the culinary arts program. Defendants state that this was done by the Special Education Administrator in response to the budget cuts that reduced the total number of paraprofessionals at the school and also to best meet the needs of special education students at Marshall. Smith Decl. ¶ 16. In Plaintiff's opinion, the position was cut at Smith's direction. Tolbert Dep. at 261, 346–47.

With regard to special education students, those with Individualized Education Plans, or "IEPs", were registered and assigned to the culinary arts program with the approval of the Special Education Administrator and in accordance with the student's IEP. A teacher is not required to have a special education certification in order to teach classes with IEP students. Plaintiff asserts that Defendants were, "dumping kids in my class," causing a disciplinary problem, and that students with no interest in culinary arts were being placed in his class. Tolbert Dep. at 261–63. Plaintiff reported his concern about having special education students in his classes to the Registrar. He was advised that although some students were designated as 6:1:1 and 8:1:1,[2] they could be in a non-core class without a paraprofessional. However, Plaintiff's complaint was not that

---

[2] Defendants are referring to the maximum class size and staffing ratios designated for special education students.  Tolbert Dep. at 260.

special education students were being placed in his class, but that the special education students who were being placed had no interest in culinary arts. Tolbert Dep. 261–63.

According to Smith, he did not provide a budget for any teacher or classroom program. Rather, the procedure was for a teacher to submit a request for supplies to the main office staff, who would then obtain the requested items. Smith Decl. ¶ 20. Plaintiff claims, on the other hand, that he had several conversations with Smith during which Smith assured Plaintiff that he would be provided with a budget for the culinary arts program. Tolbert Dep. at 250. Plaintiff testified that he understood that the Principal at Marshall allocates money, and teachers could make requests for supplies. *Id.* at 266.

Ultimately, Smith made a recommendation to eliminate the culinary arts program at Marshall due to additional budget cuts he was directed to absorb for the 2009-2010 school year. Smith set forth the considerations for discontinuing the program in an undated memorandum. Def. Ex. 18. Plaintiff disputes this, claiming that Smith had begun dismantling the program long before the budget cuts.

### *Sanitation Issues in the Jurist Room*

Throughout Plaintiff's three-year employment at Marshall the Jurist Room, as well as the rest of the school, had rodent and sanitation problems. During Plaintiff's first year (2006–2007), he spoke with an individual from Exodus Exterminators about the rodent issue. In the same year, the Monroe County Health Department cited issues in the Jurist Room facilities, preceding Smith's tenure as Principal. Tolbert Dep. (Def. Ex. 21) at 60, 148. Plaintiff denies Defendants' characterization of the rodent problem, stating

that they had "stayed on top of it" in previous years and the only issues were "facilities issues" and not specific to the Jurist Room. Tolbert Dep. at 60, 148.

In Plaintiff's second year, the Jurist Room still had issues with cleanliness and repairs well as the rodent problem. In December 2007, Plaintiff complained that he had contacted the custodial staff sixty days earlier to request repairs that remained un-addressed. The Monroe County Health Department performed an inspection of the Jurist Room in March 2008, before Smith became Principal at Marshall. Violations included unclean slicers and greasy and food-splattered walls, but the Jurist Room remained open. In the fall of 2008, Smith shut down the kitchen facility in the Jurist Room based on violations listed in the Monroe County Department of Health inspection report. A Department of Health report dated January 5, 2009, indicated that Smith had shut down the kitchen and in order for it to re-open for cooking, the Department of Health must be called.

Defendants state that those issues stemmed from both the janitorial staff and Plaintiff and his students failing to properly clean and maintain the facility. Smith Decl. ¶ 23, 44. Plaintiff contends that neither he nor his students were responsible for cleaning the facility, only for cleaning and sanitizing some of the Jurist Room's equipment and cookware, such as smallwares, appliances, cooking surfaces, and cabinets. Tolbert Dep. at 56. The parties do not dispute that students were responsible for cleaning and sanitizing of smallwares, which included chef knives, paring knives, slicers, pots, pans, a food processor, and large equipment, which included refrigerators, stoves, oven tops,

6

countertops, inside and outside of cabinets, slicers, and a three-bowl sink for small wares.

Plaintiff maintains that the sanitation problems that arose during his third year at Marshall were due to the janitorial staff failing to properly clean the classroom. Tolbert Dep. at 55-56; Pl. Ex. 56. Defendants assert that Plaintiff did not work especially well with Patti Strassner, the head of the janitorial staff at Marshall. When asked if they got along or had a strained relationship, Tolbert testified that "we both stand firm on our thought processes," but states that the two worked well together "for the most part." Tolbert Dep. at 148.

As previously mentioned, the entire school, including the Jurist Room, had a longstanding rodent problem, which preceded Smith's tenure at Marshall. The District had a contract in place with an exterminator for services to address the problem when Smith arrived at the high school. During the three years Plaintiff taught at Marshall, pest control was provided by the same outside exterminating company.

### Formal Teacher Observations

The Formal Teacher Observation, or FTO, is a routine evaluation process provided for in the collective bargaining agreement between the Rochester Teachers Association and the District. The process calls for three FTOs of non-tenured teachers per school year. The observations are conducted by building-level administrators. Plaintiff knew in advance when his FTOs would occur, and who was coming to observe on that date. Tolbert Dep. at 101–02. Plaintiff contends that his third-year annual observation had been reassigned from Jason Muhammad to Avery-DeToy, and he was not given

7

proper notice in advance of Avery DeToy's observation. Evan Wilson ltr to John Hickey (Pl.'s Ex. 52), undated, ECF No. 21-2. The evidence he submits in support of this assertion, however, only supports that he was not notified that it was Avery-DeToy who would be conducting the observation. Pl.'s Ex. 52.

Avery-DeToy conducted three FTOs during Plaintiff's second year, dated November 14, 2007, February 7, 2008, and February 27, 2008. For each of these observations, Plaintiff received an overall rating of "meets professional standards." Formal Teacher Observation forms, Nov. 14, 2007, Feb. 8, 2008 & Feb. 27, 2008 (Pl. Exs. 64, 67, 68). Avery-DeToy also performed Plaintiff's year-end evaluation, for which he received the same overall rating.

Plaintiff signed and checked both February 2008 FTO forms completed by Avery-DeToy. At a pre-conference for the February 27, 2008, FTO, Plaintiff and Avery-DeToy discussed creating student-centered, hands-on learning. Plaintiff also understood that the "workshop model" was something he was to follow for his lesson plans. Plaintiff points out that in both FTOs, Avery-DeToy noted that Plaintiff's class was in fact "student centered." Pl.'s Ex 67 & 68.

Plaintiff agreed with Avery-DeToy's recommendation that he was to improve his use of the workshop model, pursuant to the February 7, 2008, FTO. Avery-DeToy offered to work together with Plaintiff to keep using the format for future planning. Tolbert Dep. at 117-18. Plaintiff states, however, that Avery-DeToy saw Plaintiff's other lesson plans and "thought they were great." Tolbert Dep. at 111. Also in the February 7, 2008, FTO, Avery-DeToy noted "most of today's lesson was auditory, teacher giving infor-

mation verbally." She gave a summary rating of "meets professional standards." Plaintiff acknowledged and signed the FTO.

Avery-DeToy completed Plaintiff's second year-end evaluation dated May 15, 2008. Plaintiff again acknowledged and signed that he agreed with Avery-DeToy's suggestions.

During Plaintiff's third and final year as a probationary teacher at Marshall in 2008–2009, Avery-DeToy conducted an FTO of Plaintiff on November 12, 2008. For this FTO, Avery-DeToy rated Plaintiff's performance as "unsatisfactory." Avery-DeToy Decl. ¶ 22, Nov. 29, 2011, ECF No. 18-2; Pl. Ex. 62. Therein, Avery-DeToy made recommendations to change or improve the way Plaintiff was teaching his class—the same recommendations she had made in all of her previous FTOs, such as encouraging Plaintiff to use the workshop model and raising the issue that Plaintiff had re-used a lesson plan. Plaintiff shared his concern with Avery-DeToy that her comments may have been written for retaliatory purposes. Tolbert Dep. 235–36, Dec. 15, 2011, ECF No. 18-4; Evaluation of September 2008–April 2009, Additional Issues, Dec. 15, 2011, ECF No. 18-4. He did not, however, tell her that he had concerns that she was treating him unfairly due to his race. Tolbert Dep. at 236.

Also during his third year, Plaintiff was formally observed by two other administrators, on January 6, 2009, and April 6, 2009. Both FTOs made recommendations for areas in need of improvement, and reported an overall rating of "meets professional standards." Def. Ex. 7 & 8.

Avery-DeToy conducted a final evaluation on April 29, 2009, and indicated a summary rating of "below professional standards." Avery-DeToy Decl. ¶27. Although he was required to sign and return his final, third-year evaluation stating whether he agreed or disagreed with the recommendation, Plaintiff did not do so, nor did he submit a rebuttal.

In addition to the critiques by Marshall administrators in Plaintiff's FTOs, Avery-DeToy and Zone Chief Susan Kauffman recommended that Plaintiff contact the Careers in Teaching program for professional support and mentoring. Plaintiff did so, and was paired with a teacher/mentor named Jeff Feinberg. However, subsequently, Plaintiff did not further pursue the mentoring program. Tolbert Dep. at 283; Evaluation for Sept. 2008–April 2009, at III, Comments (Def. Ex. 22). Additionally, Plaintiff recalls going to East High School with Avery-DeToy to observe its culinary arts program during his third year, as the program at East was considered to be very successful. Plaintiff goes on to state, however, that he was prevented from making further visits because the District would not provide him with a substitute teacher. Tolbert Dep. 200–01.

### Denial of Tenure

At the conclusion of his third year, Avery-DeToy conducted Plaintiff's evaluation for a tenure recommendation. Avery-DeToy did not recommend Plaintiff for tenure, but instead recommended that he be granted a fourth year extension of probationary status. Avery-DeToy Decl. ¶ 28. Plaintiff contends that it was Smith who recommended to Superintendent Jean-Claude Brizard ("Superintendent Brizard") that Plaintiff not be granted tenure following Avery-DeToy's negative evaluations. Smith Dep. (Pl. Ex. A) at 15.

Further, it was common practice for a tenure recommendation to be made following consideration of a teacher's performance during the entire three-year probationary period, and not a single year of observations. Munno Dep. (Pl. Ex. A) at 35.

A fourth-year extension agreement was provided to Plaintiff at his final evaluation on April 29, 2009. In this regard, Plaintiff was advised that he would be assigned to East High School in 2009–2010 where he would work in their culinary arts program, which had been successful. In that regard, Superintendent Brizard had authorized funding for Plaintiff's placement at East. Plaintiff, though, disputes that he was ever given a concrete proposal to assign him to East High School. Probationary Period Extension Agreement between The Rochester City School District and Rickey L. Tolbert (unsigned), Feb. 14, 2012, ECF No. 21-2 (Pl. Ex. 12); Tolbert Dep. at 368; Williams Dep. at 77–78; Keating Dep. at 42–43. Superintendent Brizard told Plaintiff that if he signed the fourth-year agreement he would "take care of [Plaintiff]" with regard to the assignment at East, yet Plaintiff stresses that these promises were made orally and never confirmed in writing. Tolbert Dep. 328. According to Plaintiff, he was never given a concrete proposal for his fourth year, and could have been placed at any school to teach any subject. Tolbert Dep. at 368; Williams Dep. (Pl. Ex. A) at 77–78. Plaintiff's union representative, Martha Keating, testified that she was leery of Plaintiff's chances to be assigned to a culinary arts program at another Rochester high school. Keating Dep. (Pl. Ex. A) at 42–43. Plaintiff rejected the offer of a fourth probationary year.

**Allegations of Unfair Treatment**

Plaintiff first considered he was being treated unequally based on his race after he received his initial unsatisfactory FTO in November 2008, and then became concerned about attaining tenure sometime in November or December of 2008. In December, 2008, Plaintiff emailed Superintendent Brizard and members of the Board of Education stating that he believed he was being retaliated against because of his complaints about sanitary conditions in the Jurist Room. Although he did not state in his email that he believed the unfair treatment was racially motivated, he did indicate that he was "being abused at the [District], and working in fear every day." Email from Turner_Erica@roberts.edu to mightymalik@aol.com (Dec. 29, 2008 4:21 p.m.) at 1 (signed by Rickey Tolbert) (Pl. Ex. 88).

The District's Office of Safety and Security investigated and reported on Plaintiff's concerns about his not being recommended for tenure. The May 2009 report is entitled "Rickey Tolbert Review." Def. Ex. 22.[3] James Shepard, the Director of Safety and Security, is also an African-American male. In his report, Shepard concluded that the District's offer to Plaintiff of a fourth probationary year was appropriate.

---

[3]  Plaintiff states that James Shepard, the Director of Safety and Security, prepared the report after speaking with Plaintiff, Sue Kaufmann, and Jamie Warren, but did not conduct any independent investigation. Moreover, Plaintiff contends that the report is hearsay and does not contain any admissible facts. Here, Plaintiff has not provided a citation to evidence in the record to support his assertion. Accordingly the Court disregards it and other purported facts not supported by a valid citation. *See Shortt v. Congregation KTI*, No. 10 Civ. 2237, 2013 WL 142010, at *1 n. 2 (S.D.N.Y. Jan. 9, 2013) ("[I]n analyzing the instant motion, the Court has disregarded averments in Plaintiff's 56.1 Response that are ... not supported by citations to admissible evidence in the record ... or that are improper legal arguments.").

Superintendent Brizard ultimately followed Smith's recommendation and did not grant Plaintiff tenure in 2009. Since Plaintiff rejected the extension agreement, his employment with the District ended.

## DISCUSSION

### *Summary Judgment Standard*

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 Moore's Federal Practice '56.11[1 ] [a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)), *cert. denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate specific facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. To do this, the non-moving party must present evidence sufficient to support a jury verdict in its fa-

vor. *Id.* at 249. "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir. 1996). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the nonmoving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir. 1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. Fed.R.Civ.P. 56(c)(1)(B). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

### Title VII

Title VII forbids an employer from discriminating against "any individual" based on that individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a).

### New York Human Rights Law

New York Executive Law § 296 provides in pertinent part as follows:

> It shall be an unlawful discriminatory practice . . . [f]or an employer or licensing agency, because of the age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

N.Y. Exec. L. § 296(1) (McKinney's 2010). The Court notes that "the standards for proving discrimination under Section 296 of the New York Executive Law are the same as

under Title VII." *Lucas v. South Nassau Cmtys. Hosp.*, 54 F. Supp. 2d 141, 146 (E.D.N.Y. 1998) (citing *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 479 (1982); *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir. 1993) (plaintiff's claim under New York's Human Rights Law "is governed by the same standards as his federal claim")). "[A]ccordingly, the New York Executive Law inquiry is subsumed within the Title VII analysis." *Id.*

### Section 1981 and McDonnell Douglas

The Second Circuit recently summarized the law with regard to a claim under 42 U.S.C. § 1981 and the burden-shifting analysis used by the courts to evaluate summary judgment motions in discrimination cases:

For a claim of employment discrimination under 42 U.S.C. §§ 1981 and 1983, we apply the familiar burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03 (1973). *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir. 2004).

"[A] plaintiff must first establish a *prima facie* case of discrimination. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment action. If the employer meets this burden, the presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the employer's explanation is pretextual." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 50 n. 3 (2003) (citation omitted). When the defendant offers a legitimate, non-discriminatory reason for the adverse employment action, the burden is on the plaintiff to point to evidence that reasonably supports a finding of prohibited discrimination; otherwise, the defendant is entitled to summary judgment. *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001). "Of course, to defeat summary judgment ... the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited

> factor was at least one of the motivating factors." *Back*, 365
> F.3d at 123 (internal quotation marks and brackets omitted).

*Garcia v. Hartford Police Dep't.*, 706 F.3d 120, 127 (2d Cir.2013).

## ANALYSIS

Defendants move for summary judgment dismissing the amended complaint on the grounds that all of Plaintiff's claims lack merit and that Plaintiff failed to exhaust his administrative remedies prior to commencing his third and fourth claims, alleging violations under Title VII. Def. Mem. of Law at 10–24, Dec. 15, 2011, ECF No. 18-6.

The Court has reviewed the facts in the light most favorable to Plaintiff and granted all inferences in his favor. After review, the Court agrees with Defendants that Plaintiff fails to establish a *prima facie* case of discrimination, hostile work environment, and defamation.

### Discrimination Claims

In Plaintiff's first, third, and fifth claims, he asserts that he was subjected to racial discrimination when he was denied tenure at the end of his third year of teaching and his employment subsequently ended. Am. Compl. ¶¶ 40–46, 56–61, 68–71.

In order to make out a *prima facie* case of racial discrimination in this action, Plaintiff must show that (1) he is a member of a protected class; (2) his job performance was satisfactory; (3) he suffered from an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Pearson v. Unification Theological Seminary*, 785 F. Supp. 2d 141, 153 (S.D.N.Y. 2011).

16

It is undisputed that Plaintiff is African-American and therefore a member of a protected class. Plaintiff has also presented evidence that at all times until Avery-DeToy's negative performance evaluations, his job performance had been satisfactory. *See de la Cruz v. N.Y.C. Human Resources Admin. Dep't of Soc. Servs*., 82 F.3d 16, 20 (2d Cir. 1996) ("Although ordinarily courts will not second guess an employer's assertion that a particular category on a performance evaluation is decisive . . . a performance evaluation that is positive overall is sufficient to withstand summary judgment at the *prima facie* stage of analysis.") (internal citation omitted). The parties dispute the remaining two factors, which are discussed in turn below.

### 1.   Adverse Employment Action

Defendants contend that Plaintiff did not suffer an adverse employment action because, although Plaintiff was denied tenure, he was contemporaneously offered a fourth probationary year which he rejected. Def. Mem. at 12–13. Plaintiff, on the other hand, argues that the extension of a teacher's probationary period is an adverse employment action because it accompanies the denial of tenure and is analogous to an employer's failure to promote, *see Dillon v. Morano*, 497 F.3d 247 (2d Cir. 2007), or a transfer to a different job, *see Day v. Derwinski*, 771 F. Supp. 588 (S.D.N.Y. 1991). While the issue remains unresolved in this Circuit, the relevant case law tends to favor the position that a fourth-year extension of probationary employment status does not constitute an adverse employment action.

By way of background, in New York, teachers and administrators serve a three-year probationary period prior to becoming eligible for tenured status. *See* N.Y. Educ. L.

§§ 2509, 2573, 3012, 3014. The Principal then makes a recommendation to the assistant superintendent as to whether tenure should be granted. The assistant superintendent then recommends a determination to the superintendent, who in turn recommends a determination to the board of education. If the superintendent does not recommend tenure, the employee may be terminated, or if it is determined, prior to the expiration of the probationary period that tenure will not be recommended, the teacher may be offered the opportunity to enter into an agreement extending the probationary period an added year for additional performance review and tenure consideration. *See e.g., Juul v. Bd. of Educ. of Hempstead*, 76 A.D.2d 837, 428 N.Y.S.2d 319 (N.Y. App. Div. 2d Dep't 1980), *aff'd*, 55 N.Y.2d 648, (1981); N.Y. Educ. Law § 3012(2). ("At the expiration of the probationary term ... the Superintendent of schools shall make a written report to the board of education ... recommending for appointment on tenure those persons who have been found competent, efficient, and satisfactory...."). A probationary employee can be terminated at any time during the probationary period, and therefore has no legal entitlement to tenure during that time. *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.,* 96 F.3d 623 (2d Cir. 1996); N.Y. Educ. L. § 3012.

While courts in this Circuit have held that an adverse employment action occurs where the probationary period ends, tenure is denied, and the employee is terminated, Plaintiff points to no authority holding that the denial of tenure accompanied by a fourth-year extension of the probationary period qualifies as an adverse employment action. *Compare Back,* 365 F.3d at 116-17 & n. 3 (assuming, without holding, that the termination of a probationary period was an adverse employment action in the employment dis-

crimination context), *and Curcio v. Roosevelt Union Free Sch. Dist.*, No. 10 Civ. 5612, 2012 WL 3646935, at *7 (E.D.N.Y. Aug. 22, 2012) (denial of tenure and termination of probationary employment are adverse employment actions), *with Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, --- F. Supp. 2d ----, 2013 WL 5338516, at *9–*14 (S.D.N.Y. Sept. 24, 2013) (adverse employment action where plaintiff was denied tenure and her probationary employment ended but declining to reach issue of whether she suffered another adverse employment action when she was not recommended for tenure but had her probationary employment extended), *Douglass v. Rochester City Sch. Dist.*, 873 F.Supp.2d 507, 511 (W.D.N.Y. 2012) ("plaintiff cites no law, nor does research reveal any, holding that a District's offer of transfers and/or additional probationary years to an employee otherwise facing termination could be construed as an adverse employment action."), *and Smith v. Da Ros*, 777 F. Supp. 2d 340 (D. Conn. 2011) (no adverse employment action where probationary period was extended and the existing terms of his employment were not altered).

Plaintiff was not terminated in this case, but rather declined the District's offer of an additional year of probationary teaching. He does not allege that he was constructively fired, nor can he show that there would have been a materially adverse change in the terms and conditions of his probationary employment had he elected to continue his fourth year with the District, such that it would constitute an adverse employment action. A "materially adverse change" must be "more disruptive than a mere inconvenience or an alteration of job responsibilities[,]" and can include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a mate-

rial loss of benefits, significantly diminished material responsibilities, or other indices …

unique to a particular situation." *Galabya v. N.Y. City Bd. of Educ.,* 202 F.3d 636, 641

(2d Cir. 2000) (internal quotation omitted). In *Galabya,* an excessed[4] teacher was trans-

ferred to a different high school and was assigned a position teaching mainstream key-

boarding, despite the fact that his previous teaching experience had been in special ed-

ucation. 202 F.3d at 638–39. The Second Circuit concluded that the transfer did not

constitute an adverse employment action because the plaintiff could not demonstrate

that the change in responsibilities was a "setback to his career." *Id.* at 641.[5]

Here, even if Plaintiff were transferred to another school or required to teach a

subject other than culinary arts, as he contends in his papers, *see* Pl. Mem. at 14, his

responsibilities and status would have essentially remained the same. He does not al-

lege that he would have received less pay or a loss in benefits, rather, he only alleges

that there was no guarantee that he could remain in the culinary arts program. While he

characterizes the school transfer as a "demotion," *see id.* at 14–15, he points to no evi-

dence to support this assertion.[6] Plaintiff does not raise an issue of fact as to whether

he would be "worse off with respect to seniority, income, or benefits" had he completed

---

[4] "A teacher who is 'excessed' is not fired, but rather is reassigned to another position in the school system. <u>Galabya,</u> 202 F.3d at 639.

[5] While *Galabaya* was decided under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.,* the Court of Appeals noted that the standard was the same under Title VII. *Galabya,* 202 F.3d at 640 n.2; *Patrolmen's Benevolent Ass'n. of City of N.Y. v. City of N.Y.*, 310 F.3d 43, 51 (2d Cir. 2002) (applying *Galabya*'s definition of adverse employment action in a Title VII claim); *La Grande v. DeCrescente Distrib. Co., Inc.*, 370 F. App'x 206, 211 (2d Cir. 2010) (summary order) (same).

[6] For example, Plaintiff contends that he was "director of the culinary arts program," *see* Pl. Mem. at 14, yet submits no evidence that such a position existed at Marshall or that he was employed in any other capacity or had any additional responsibilities aside from his role as a culinary arts instructor.

the fourth probationary year and therefore does not show that he suffered an adverse employment action. *Shohadaee v. Metro. Gov't of Nashville v. Metro. Gov't of Nashville and Davidson Cnty.*, 150 Fed. Appx. 402 (6th Cir. 2005) (holding that teacher's one-year delay in tenure was not an adverse employment action).

Accordingly, Plaintiff has not shown that he suffered an adverse employment action when he was not recommended for tenure, but was offered an extension of his probationary teaching status. He therefore fails to establish a *prima facie* case of discrimination.

### 2.    Inference of Discrimination

Assuming, *arguendo*, Plaintiff's extension of probation does constitute an adverse employment action, his *prima facie* case nonetheless falls short since he fails to come forward with evidentiary proof in admissible form that the District's decision was racially motivated.

Although direct evidence of discriminatory motive is not necessary, Plaintiff must produce at least some circumstantial evidence that shows discriminatory animus. *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (noting that, because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial evidence, and that plaintiff must provide "more than conclusory allegations of discrimination"); *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108 (2d Cir. 1988) (even where a *prima facie* case is established, conclusory assertions of discrimination are insufficient to create an issue of material fact as to pre-

text). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to defeat a summary judgment motion. *Anderson,* 477 U.S. at 252.

Plaintiff asserts that he has presented ample circumstantial evidence to over-come the Defendants' motion for summary judgment. Pl. Mem. at 10–13, 15. For the following reasons, the Court disagrees.

### a.    Evidence of Racist Attitude

First, Plaintiff submits that District School Board members Allen Williams ("Williams") and Cynthia Elliott ("Elliott") believed race was a factor in the denial of Plaintiff's tenure and that Smith had been known to discriminate against African-American employees. Pl. Mem. at 11. Elliott testified that "when a lot more kids are put in the class than necessary, many of them who are special education kids, yeah, it does make me believe that [the situation] was based on race." Elliott Dep. (Pl. Ex. A) at 61. This testimony is problematic for two reasons: first, it does not speak of Plaintiff's negative performance evaluations or his denial of tenure, but refers to the increase in Plaintiff's class sizes during the 2008–2009 school year, which was remedied by the District shortly after Plaintiff complained. Pl. Ex. 77. Second, and more importantly, the testimony is not based on personal knowledge, but rather Elliott is describing the situation as Plaintiff related it to her, and there are no facts proffered to support her statement. Elliott Dep. at 61. Her testimony therefore cannot defeat Defendants' motion for summary judgment.

With respect to Williams' testimony that he had a conversation with a sentry at Marshall named Mr. Harrison who told him that "Smith had actually fired all the black administrators" at the school, this proffered evidence is inadmissible because it is based

on hearsay. *See* Williams Dep. (Pl. Ex. A) at 19–20. Similarly, Plaintiff cites to hearsay evidence of Williams' testimony regarding his conversation with an individual named Mr. Mohammed who was a coach at Marshall facing a demotion by Smith. *Id.* at 24–25. Not only is the Mohammad statement hearsay, but the coach's alleged demotion ultimately did not occur and, therefore, is not probative of any discriminatory conduct by Smith. *Id.* at 26.

Plaintiff also states that Superintendent Brizard told Williams that he was aware of "problems" with Smith at Marshall. Pl. Mem. at 11 (citing to Williams Dep. at 38–39, 82–84). Although the word "problems" is scattered throughout Williams' testimony with regard to Smith, nothing in the five pages of deposition transcript identifies what those problems were or indicates that they related to Smith's alleged discriminatory history. Plaintiff goes on to claim that Superintendent Brizard received complaints about both Smith and Avery-DeToy, yet the portions of the deposition transcripts he cites to do not support his statement. Brizard Dep. at 20, 27. Rather, Superintendent Brizard testified that he received an email indicating that Shirley Billups-Bell, a District employee, received a complaint from Plaintiff regarding racial remarks.[7] Moreover, Superintendent Brizard specifically testified that he "[knew] of no connections" relating to a pattern of discrimination by Avery-DeToy against African-American males. *Id.*

Although Plaintiff submits affidavits by Rev. Willie Harvey and Marshall Counselor Barbara Postell ("Postell") to the effect that Board President Malik Evans ("Evans") told each of them that Smith was a racist, *see* Harvey Aff. ¶¶ 4, 5, 8, Oct. 21, 2010, ECF No. 21-8; Postell Aff. ¶ 10, Nov. 3, 2010, ECF No. 21-9, these statements also consti-

---

[7] The Court has been unable to locate this email within the parties' exhibits.

tute inadmissible hearsay. Significantly, Evans' own sworn testimony indicates that he had not heard of any racial discrimination issues with Smith. Evans Dep. at 13–17, Mar. 16, 2012, ECF No. 22-1.

In support of his claim that Smith had "trouble with numerous African American employees," Pl. Mem. at 16–17, Plaintiff submits an Equal Employment Opportunity Commission complaint filed against the District by Postell in December 2009, post-dating Smith's alleged discriminatory actions in this case by two years. Postell's complaint was found to be without merit and was denied by the EEOC and is therefore of little probative value here.

Plaintiff must provide more than conclusory allegations to defeat a motion for summary judgment. See *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). He has failed to do so here. Plaintiff offers no concrete particulars as to why a trial is warranted, and, while he submits several affidavits, almost none are based upon the personal knowledge of the witnesses and/or constitute inadmissible hearsay, and therefore cannot survive Defendant's summary judgment motion. *See Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001) (evidence considered sufficient to defeat summary judgment is generally offered in the form of affidavits or deposition testimony and must be based upon the personal knowledge of the witness, set forth facts admissible in evidence, and the speaker must be shown competent to testify thereto.)

### b.   Negative Evaluations

Second, Plaintiff claims that Avery-DeToy's negative performance evaluations were racially motivated, Pl. Mem. at 12–13. However the record shows that Avery-

DeToy also conducted four previous FTOs and one year-end evaluation in which she summarized Plaintiff's performance as "meets professional standards," and made certain professional recommendations in areas where she felt Plaintiff needed improvement. In her two subsequent evaluations in which she rated Plaintiff as "unsatisfactory" and "below professional standards," Avery-Detoy remarked that Plaintiff had not shown improvement in the areas she repeatedly noted in all of her evaluations, despite Plaintiff acknowledging his shortcomings each time. Pl. Exs. 62, 64, 67, 68, 70, 72, Feb. 14, 2012, ECF No. 21-2. Former Principal Munno testified that Avery-DeToy had never spoken negatively about Plaintiff. On this record, no racial motivation can be attributed to Avery-DeToy. Nonetheless, Plaintiff appears to assert that Avery-DeToy conducted the evaluations and reported negatively at the behest of Smith, although there is no evidence to support Plaintiff's position. Avery-DeToy testified that Jason Muhammad was not completing his observations by the mandatory deadline and, due to the concern that he would not finish Plaintiff's in time, Avery-DeToy conducted the observation instead. Avery-DeToy Dep. at 177 (Def. Ex. 29). There is no evidence in the record to refute this.

Further, there is no nexus between Plaintiff's negative FTOs and any alleged racial discrimination by Smith. Avery-DeToy performed Planitiff's FTOs during his first two years at Marshall, finding that Plaintiff "met professional standards" but was never "proficient" or "distinguished." Pl. Exs. 64, 67, 68, 70. During his third year, Avery-DeToy noted that Plaintiff had not yet implemented the workshop model she had encouraged him to use in her previous evaluations and rated Plaintiff as "unsatisfactory." Pl.'s Ex. 62. Subsequent FTOs conducted by Muhammad and Bianchi echoed the same criti-

cisms that Avery-DeToy noted, including recommending more student-centered learn-
ing, decreasing lecture time during Plaintiff's lessons, engaging in more parent commu-
nication, and working with administrators or attendance liaisons to improve classroom
management. Both administrators ranked Plaintiff as "meeting professional standards."
Pl. Exs. 89, 90. Finally, in Avery-DeToy's year-end evaluation in which she did not rec-
ommend Plaintiff for tenure, she noted that Plaintiff had again failed to implement the
workshop model for daily lesson planning, and, despite being offered multiple opportuni-
ties for professional development, such as shadowing the culinary arts instructor at East
High School and undertaking peer assistance with lesson planning, Plaintiff did not avail
himself of any of those opportunities. Pl. Ex. 72. Avery-DeToy rated Plaintiff as being
"below professional standards" in three of four categories. *Id.* When examining Plaintiff's
three years of FTOs as a whole, it appears that the process was indeed consistent and
that Plaintiff simply failed to show improvement in critical areas noted by all three ad-
ministrators. The fact that Plaintiff disagrees with Avery-DeToy's conclusions is not suf-
ficient establish a *prima facie* case of discrimination. *See Holt v. KMI-Continental, Inc.*,
95 F.3d 123 (2d Cir. 1996).

With regard to the process of tenure evaluation, it is undisputed that Superinten-
dent Brizard testified that he only reviewed Plaintiff's final year of evaluations and ob-
servations when he decided to accept Smith's recommendation. While this may amount
to a procedural irregularity, it does not give rise to an inference of discrimination where
there is no other evidence connecting the tenure determination to Smith's alleged racial
animus. *See, e.g.*, *Tori v. Marist College*, 344 Fed. Appx. 697, 701 (2d Cir. 2009)

("summary judgment is appropriate where there is no evidence that discrimination played a role in any alleged procedural irregularities.") In any event, there is no evidence that the initial decision to not recommend Plaintiff for tenure by both Smith and Avery-DeToy was based on anything other than Plaintiff's three-year track record. Smith Decl. ¶¶ 20-23.

Finally, Plaintiff offers as evidence the testimony of former Principal Munno, who stated that he was "surprised" that Plaintiff was not granted tenure. Munno Dep. at 65. This also fails to defeat Defendants' motion. Munno had been Principal at Marshall until February, 2008, oversaw Avery-DeToy as a subordinate, and was aware of her satisfactory FTOs of Plaintiff up to that point. *Id.* at 24, 27. Although Plaintiff appears to argue that the negative evaluations by Avery-DeToy were used by Smith to accomplish his discriminatory purposes, the evidence shows that Avery-DeToy continued to give Plaintiff satisfactory FTOs until November, 2008, long after Munno's departure. That being the case, Munno would have no personal knowledge of Plaintiff's progress, or lack thereof, in his final probationary year and, therefore, his fitness for tenure. Pl. Ex. 93. Significantly, upon learning that Plaintiff was denied tenure, Munno did not contact anyone at the District regarding the Board's decision and did not discuss with Plaintiff the possibility that the denial of tenure was based on Plaintiff's race. Nor, did Plaintiff ever raise the concern directly to Munno that the determination may have been related to his race. Munno Dep. at 65. Accordingly, Munno's testimony fails to create an issue of fact as to whether the negative performance evaluations were racially motivated.

###### c. Racial Comments

Third, Plaintiff avers that Smith made several racist remarks evincing a discrimi-natory attitude. First, Smith allegedly told a group of students, "you people don't under-stand what it takes to run a school." Tolbert Dep. at 349; Coley Aff. ¶ 10. While Plaintiff suggests that Smith's remark was referring to African-Americans, he also testified that a gay Caucasian student was present and took offense to the comment, Tolbert Dep. at 353-55. It is undisputed that the comment was made to a group of individuals of mixed gender and ethnicity. Regardless, without context, the phrase "you people" is not inher-ently discriminatory—It refers to no particular group of people and, under the circum-stances, no reasonable juror could conclude that the comment was intended to refer or discriminate against African-Americans in particular. *Peterson v. Long Island R. Co.,* No. 10 Civ. 480, 2012 WL 2319238, at *11 (E.D.N.Y. July 19, 2012) (finding no infer-ence of discrimination where supervisor's use of the phrase, "you people" was unclear as to whether it was a reference to plaintiff's race or to employees on FMLA leave); *Grif-fin v. Ambika Corp.*, 103 F. Supp. 2d 297, 314 (S.D.N.Y. 2000) (defendant's alleged use of phrases "street person," "break up the gang," and "you people" was not actionable without greater specificity as to the context of their usage).

Similarly, Postell testified that Smith made the comment, "they are not like us," referring to students during a discussion about student behavior and disciplinary mat-ters. Postell interpreted this is as racist remark, as most of the students at the school are black. However, use of the word "they" alone cannot be deemed racially offensive,

in light of the fact that it was in reference to the entire student body, which was comprised of Caucasian, Hispanic, and African-American students.

Next, Plaintiff contends that Smith made remarks about cooking "black food" to him and to a student. Sha'Kwanda Coley, a former Marshall student, submitted a sworn affidavit that Smith asked her "how [she] expected to learn if all [she] was learning to cook was black food." Coley Aff. ¶6. In the same vein, Plaintiff testified that during a meeting a week before homecoming Smith asked Plaintiff, "Do you only know how to cook black, or can you cook American too?" Tolbert Dep. at 347. Finally, another former student alleges that Smith said to him, "black kids can't learn in a cooking class because all they want to do is eat." Hart Aff. ¶4. None of these comments above were ever reported or addressed prior to the commencement of this lawsuit, and Smith denies making any such remarks. Smith Reply Decl. ¶6-7. Assuming only for the purposes of the present motion that Smith did make the comments attributed to him, the question remains as to whether the remarks constitute evidence of discriminatory motivation or are merely "stray remarks" which, without more, generally do not constitute sufficient evidence to support a case of employment discrimination. *See Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d. Cir. 1998)); *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) ("the stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination").

"Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff." *Silver v. N. Shore Univ. Hosp.,*

490 F. Supp. 2d 354, 362 (S.D.N.Y. 2007). Courts have found the following factors relevant to such a determination: "(1) who made the remark, *i.e.*, a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, *i.e.*, whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, *i.e.*, whether it was related to the decisionmaking process." *Silver*, 490 F. Supp. 2d at 363 (citations omitted).

Here, Smith was the decisionmaker, in terms of Plaintiff's tenure recommendation, as well as the continuation of the culinary arts program at Marshall. The remarks, if true, are at the least highly insensitive and impolite, and at most, racially discriminatory.

While there is no bright line rule regarding what length of time renders an allegedly discriminatory remark too attenuated to constitute evidence of discrimination, courts in this Circuit have generally found that a five month lapse between an allegedly discriminatory statement and an adverse employment action is too long a gap to find the remark probative of discrimination without some other evidence that the remark was related to the adverse employment action. *See, e.g., Yoselovsky v. Assoc. Press*, 917 F.Supp.2d 262, 278 (S.D.N.Y. 2013) (collecting cases holding that comments made four to five months prior to the plaintiff's termination did not constitute evidence of discrimination); *Callistro v. Cabo*, No. 11–CV–2897, 2013 WL 322497, at *7–8 (S.D.N.Y. Jan. 25, 2013) (four month gap too long for discriminatory remarks to indicate that the defendants terminated plaintiff with discriminatory intent, where there was no evidence that discriminatory remarks were made in relation to the termination decision); *Del Franco v.*

*N.Y.C. Off–Track Betting Corp.*, 429 F. Supp. 2d 529, 537 (E.D.N.Y. 2006) (finding no temporal connection where "slightly more than three months" elapsed between the alleged discriminatory remarks and the plaintiff's termination), *aff'd*, 245 Fed. Appx. 42 (2d Cir. 2007). Since nearly an entire school year had lapsed between the meeting between Smith and Plaintiff in fall of 2008, and the denial of tenure at the end of the school year, Plaintiff cannot rely on the comments' temporal proximity to render them probative of discrimination. Likewise, the comments made by Smith to two African-American students in October, 2008, and January, 2009, are too attenuated with respect to the denial of Plaintiff's tenure which occurred in June, 2009.

Moreover, there is no nexus between the tenure determination and Smith's alleged racial comments. There was never any mention in any of his evaluations criticizing the content of his courses or any reference to teaching only African-American cuisine. Rather, the criticisms stemmed from Plaintiff's teaching methods, pedagogy, and classroom management as opposed to the subject matter. Thus, a reasonable jury could not conclude that in making the alleged comments about "black food" or "black cooking," Smith was explaining why Plaintiff would not be selected for tenure at the end of that school year.[8] *C.f. Tomassi v. Insignia Financial Grp., Inc.*, 478 F.3d 111, 116 (2d Cir. 2007) (holding that the discrimination-related remarks "could reasonably be construed" as explaining why the decision to terminate the plaintiff was taken, and, considering all the circumstances, a jury could find the remarks as "persuasive evidence" that the plaintiff's termination was motivated by discrimination); *Terry v. Ashcroft*, 336 F.3d 128, 139 (2d Cir. 2003) (finding that comments attributing plaintiff's failure to receive the

---

[8]  The Court emphasizes that there is also no evidence in the record linking Smith's alleged race-based discriminatory animus and Avery-DeToy's negative evaluations.

job at issue to his "being too old to promote," could support an inference that age was a factor in promotion decisions); *Klings v. N.Y. State Office of Court Admin.*, No. 04–CV–3400, 2010 WL 1292256, at *15 (E.D.N.Y. Apr. 5, 2010) ("[S]upervisors' remarks may be probative of a discriminatory motive when they describe why a decision was made." (citing *Tomassi*, 478 F.3d at 115)); *Dupree v. UHAB-Sterling St. Housing Dev. Fund Corp.*, No. 10–CV–1894, 2012 WL 3288234, at *6–7 (E.D.N.Y. Aug. 10, 2012) (holding that statements such as defendants had "a practice of not hiring black people" were "directly related to the claimed discriminatory motive in terminating [plaintiff] and 'could reasonably be construed ... as explaining why that decision was taken." (quoting *Tomassi*, 478 F.3d at 116)). In the absence of a clearly demonstrated nexus to an adverse employment action, "stray workplace remarks" such as these are insufficient to defeat Defendants' summary judgment motion. *Almonord v. Kingsbrook Jewish Med. Ctr.*, No. 04–CV–4071, 2007 WL 2324961, at *9 (E.D.N.Y. Aug. 10, 2007) (citing *Danzer*, 151 F.3d at 65).

After reviewing the entire record and construing the facts in Plaintiff's favor, the Court agrees with Defendants that Plaintiff cannot show that he has suffered an adverse employment action that was a product of discriminatory animus. Because Plaintiff has failed to establish a *prima facie* case of discriminatory denial of tenure, the Court grants summary judgment in favor of Defendants on the racial discrimination claims brought under § 1981, Title VII, and NYHRL, and dismisses the first, third, and fifth claims in the amended complaint.

***Hostile Work Environment***

In claims four and five of the amended complaint, Plaintiff alleges that Principal Smith subjected him to a hostile work environment based on his race by dismantling the culinary arts program at Marshall and exhibiting a racially discriminatory attitude. Am. Compl. ¶¶25, 30, 62-67.

The legal standards for a hostile environment claim are well settled:

> In order to establish a hostile work environment claim ... a plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered. A hostile working environment is shown when the incidents of harassment occur either in concert or with a regularity that can reasonably be termed pervasive. The plaintiff must show more than a few isolated incidents ..., although a hostile work environment can also be established through evidence of a single incident of harassment that is extraordinarily severe.

*Fincher v. Depository Trust and Clearing Corp.,* 604 F.3d 712, 723–724 (2d Cir. 2010) (citations and internal quotation marks omitted); *see also*, *Fitzgerald v. Henderson*, 251 F.3d 345, 360 (2d Cir. 2001) ("If a rational juror could infer that a reasonable employee would have viewed a given series of events as materially worsening her working conditions, summary judgment dismissing her hostile work environment claim on the ground of lack of an adverse employment decision is inappropriate."). In this regard, the Court must not "view individual incidents in isolation," or "view the record in piecemeal fashion," but instead, should consider the "totality of the circumstances, viewed from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances including the social context in which particular behavior occurs and is experi-

enced by its target." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012) (citations and internal quotation marks omitted).

In determining whether conduct constitutes a hostile work environment, the Court must consider the frequency and severity of the discriminatory conduct, whether the conduct is physically threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's work performance. *See Winnie v. City of Buffalo*, No. 00-CV-0128, 2003 WL 251951, *4 (W.D.N.Y. Jan. 13, 2003) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

In support of his claim, Plaintiff posits that Smith took steps to dismantle the culinary arts program by increasing Plaintiff's class sizes, placing special education students in the culinary arts program, eliminating the classroom aide position, refusing to have janitorial staff clean the Jurist Room, failing to implement a new curriculum that Smith requested from Plaintiff, and eliminating the program's budget. Am. Compl. ¶ 25.

At the outset, Plaintiff does not offer any evidence that his problems concerning the administration of the culinary arts program are attributable to Smith. With regard to the issue of increasing class sizes, Smith states that he was not responsible for the assignment of students to a particular class. Smith Decl. ¶¶ 14-15. When Plaintiff raised the issue to Marshall administrators, it was addressed and resolved so that Plaintiff's student-teacher ratio would comport with the controlling collective bargaining agreement. Pl. Ex. 11. The final class size of 24, although not ideal for hands-on learning application as Plaintiff desired, was nonetheless within the required parameters of Plaintiff's collective bargaining agreement. Likewise, the assignment of special education

students to any particular class was handled by Special Education Administrator, and not Smith. Smith Decl. ¶14.

It is undisputed that Plaintiff's complaints regarding the janitorial staff and sanitary conditions pre-dated Smith's tenure, and the Jurist Room had a longstanding rodent problem. Tolbert Dep. at 150–52. When Plaintiff raised his concerns about the custodial staff to Smith, they were addressed. Smith Decl. ¶ 23; Strassner Decl. (Def. Ex. 30) ¶10. Since the Jurist Room's sanitation issues existed prior to Smith's tenure at Marshall, the declination in custodial services, negative health inspections by Monroe County, and subsequent closure of the kitchen facility cannot be attributed to any racial animus on the part of Smith.

Further, there is no evidence that Plaintiff created and/or submitted a new culinary arts curriculum to Smith at his request; rather, Plaintiff submitted a curriculum from the Culinary Institute of America that Smith understood Plaintiff was following in 2008–09. Smith Decl. ¶¶ 28-29.

Finally, with regard to Smith's elimination of the culinary arts program from Marshall, School Board President Evans testified that the culinary arts program was cut due to a massive budgetary deficit in 2009–2010. Evans Dep. at 23–24. The widespread budget reductions in the District, including those affecting Marshall, are not refuted by the parties.

It is worth noting that Plaintiff first alerted Board of Education Commissioner Elliott that he was being retaliated against (because of his complaints about the sanitary conditions of the Jurist Room) in November or December 2008, following his first nega-

35

tive FTO. Tolbert Dep. at 72–73. Approximately one month later, at the end of December 2008, or beginning of January 2009, he made the allegation to Elliott that his unequal treatment was based on his race. *Id.* at 74. In Plaintiff's letter to the school board members, he stated that he "[was] being abused … and working in fear everyday," but does not mention the issue of race. Rather, the correspondence appears to have been written in response to Plaintiff's first negative FTO and also to address the cleaning and budgetary issues with respect to the culinary arts program. Email from Turner_Erica@roberts.edu (signed by Rickey Tolbert) to mightymalik@aol.com (addressed "To The Superintendent: Brizard"), Dec. 29, 2008 4:21 p.m. (Pl. Ex. 88). Likewise, in an email addressed to Beverly Gushue, who oversaw the home and careers department, Plaintiff lists a number of concerns such as funding, security, and custodial issues, but does not mention the alleged discrimination by Smith. Email from Tolbert, Rickey to Gushue, Beverly, Nov. 4, 2008 2:56 p.m. (Pl. Ex. 31). Plaintiff's Exhibits 42, 52, 56, 88 and 92, ECF 21-2, submitted in connection with his opposition, make no mention of race or discrimination at all. There is therefore no material issue of fact on this record that the decline of the Jurist Room and the culinary arts program at Marshall could be attributed to racial discrimination.

In summary, none of these changes in the culinary arts program reveals the presence of racial discrimination. In an attempt to suggest that he was targeted because of his race, Plaintiff also contends that Smith exhibited a discriminatory attitude when he made comments to Plaintiff and students about "cooking black," and made a statement about his students cleaning up after the rodents, which Plaintiff interpreted to be a racist

statement insinuating that his students are only fit for janitorial work. Am. Compl. ¶30(A)-(B).[9] Smith denies or does not recall making either statement. Smith Decl. ¶ 44.

In any event, Plaintiff has failed to establish, as part of his *prima facie* case, that the alleged harassment was sufficiently severe or pervasive. The alleged remarks by Smith regarding "cooking black," though inappropriate, were stray remarks that cannot form the basis of a hostile work environment claim. "Title VII is not a 'general civility code.'" *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999), quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). While it is true that offensive language need not be directed toward a plaintiff in order to contribute to a hostile work environment, *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997), a few isolated incidents of "boorish or offensive use of language" are generally insufficient to establish a hostile work environment. *Benette v. Cinemark U.S.A., Inc.*, 295 F. Supp. 2d 243, 251 (W.D.N.Y. 2003); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (conduct must be severely threatening or humiliating to rise to the level of a hostile work environment); *Kotcher v. Rosa & Sullivan Appliance Ctr.*, 957 F.2d 59, 62 (2d Cir. 1992) ("incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief").

Moreover, the racial comments Smith allegedly made to students about "cooking black" and black students not being able to learn culinary arts "because all they want to do is eat," as set forth in two affidavits submitted in connection with the present motion,

---

[9] Plaintiff urges the Court to consider that School Board member Williams testified that Smith had trouble with African-American administrators at Marshall, and that School Board president Evans told Postell and Rev. Harvey that Smith was racist. Pl. Mem. at 17. As noted earlier, these assertions are not supported by admissible evidence and cannot be used to oppose Defendant's motion.

have little relevance here, as there is nothing in the record that indicates Plaintiff was aware of either statement at the time they were made, and the affidavits are dated approximately two years after Plaintiff's employment ended. *See e.g., Harris*, 510 U.S. at 21-22 ("if the victim does not subjectively perceive the environment to be abusive ... there is no Title VII violation").

Finally, with respect to Smith's alleged comment that the students should pick up the rodent traps, it is important to note that the culinary arts students were of racially and ethnically diverse backgrounds and such a comment is subject to a non-race-related interpretation.

When viewed collectively, and with the benefit of undisputed facts concerning their context, Plaintiff's allegations describe isolated incidents over a period of one school year, which are not sufficiently severe, frequent, threatening, humiliating or distracting to give rise to a hostile work environment. *See Hannon v. Wilson Greatbatch, Ltd.*, No. 00-CV-0203, 2002 WL 1012971, *7 (W.D.N.Y. Apr. 24, 2002) (the "mere utterance of an epithet which engenders offensive feelings" is insufficient to sustain a hostile work environment claim); *Clark Cnty. Sch. Dist.*, 532 U.S. at 270 (conduct must be severely threatening or humiliating to rise to the level of hostile work environment); *Brown v. Coach Stores, Inc.*, 163 F.3d 706 (2d Cir. 1998) (occasional offensive racial comments are not sufficiently severe or pervasive to establish a hostile work environment).

Here, following the completion of discovery,[10] Plaintiff has not demonstrated the requisite nexus that would bind together the alleged remarks and the administrative changes to the culinary arts program in a way that establishes that they are part of an

---

[10] Discovery was completed in August 2011. *See* Stipulation Extending Deadlines for Discovery and Motions, Sept. 28, 2011, ECF No. 17.

overarching pattern. *See, e.g., Hinton v. City Coll. of N.Y.,* No. 05 Civ. 8951, 2008 WL 591802, at *19 (S.D.N.Y. Feb. 29, 2008) (explaining that while the plaintiff complained about her classrooms and teaching schedules, among other things, she pointed to no evidence connecting those matters to any sexist animus.) Moreover, the isolated remarks described by Plaintiff ~~Williams~~ are insufficient in both number and degree of severity, even if fully credited by the jury, to constitute a racially hostile work environment. *See Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999) (as a general matter, however, isolated remarks or occasional episodes of harassment do not constitute a hostile environment within the meaning of Title VII); *but see Torres v. Pisano*, 116 F.3d 625, 631–32 (2d Cir. 1997) (*prima facie* case of sexually and racially hostile work environment established where male supervisor allegedly made comments using sexual vulgarities, suggested that the plaintiff engaged in sex for money, ridiculed her pregnancy, commented on her anatomy and his desire to have sex with her, allowed friends of his who visited him at the office to make crude sexual remarks about her, repeatedly called her a "dumb spic," and told her that she should stay home, go on welfare, and collect food stamps like the rest of the "spics.").

Having examined all of Plaintiff's allegations in the totality of the circumstances, the Court determines that he has failed to establish a material issue of fact as to the existence of a hostile work environment. *See De La Cruz v. City of New York*, 783 F. Supp. 2d, 622, 644 (S.D.N.Y. 2011) (holding that allegations of work reassignment, schedule changes, increased scrutiny of plaintiff's work, and a supervisor's stray re-

marks were insufficient to establish hostile work environment). Claims four and five of the amended complaint alleging a hostile work environment are therefore dismissed.[11]

### Defamation

In the second claim of his amended complaint, Plaintiff asserts a defamation cause of action pursuant to New York law. He alleges that Smith made the following false and defamatory statements to Marshall students, or staff, or both: (1) the Jurist Room had been shut down by the county health department; (2) the Jurist Room had been shut down by the county health department during the previous school year; (3) Plaintiff did not clean his kitchen; and (4) Plaintiff had spent District funds that he was not authorized to spend. Am. Compl. ¶¶ 47–55.

"To state a claim for defamation under New York law, Plaintiff must establish: (1) that a defamatory statement of fact was made concerning [the p]laintiff; (2) that the defendant published that statement to a third party; (3) that the statement was false; (4) that there exists some degree of fault; and (5) that there are special damages or that the statement is defamatory *per se*[.]" *Ello v. Singh*, 531 F. Supp. 2d 552, 575 (S.D.N.Y. 2007) (citation and internal quotation marks omitted). Defamation *per se* involves statements: "(i) charging plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman." *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992).

---

[11] Because Title VII's administrative exhaustion requirement is not jurisdictional, *see Boos v. Runyon*, 201 F.3d 178, 182 (2d Cir. 2000), the Court need not address the parties' exhaustion arguments. Plaintiff's claims of racial discrimination and hostile work environment plainly fail as a matter of law. *See Khan v. HIP Centralized Lab. Servs., Inc.*, No. 03–CV–2411, 2007 WL 1011325, at *3 (E.D.N.Y. Mar. 30, 2007) ("It is not necessary to decide [the] issue [of whether plaintiff failed to exhaust his administrative remedies], because ... plaintiff's ... claim fails on the merits.").

The "trade, business or profession" category is applicable when the defamation is "of a kind incompatible with the proper conduct of the business, trade, profession, or office itself." *Liberman*, 80 N.Y.2d at 436; *see also Van–Go Transp. Co., Inc. v. N.Y.C. Bd. of Educ.*, 971 F. Supp. 90, 98 (E.D.N.Y. 1997) ("Reputational injury to a person's business, or to a company, consists of a statement that either imputes some form of fraud or misconduct or a general unfitness, incapacity, or inability to perform one's duties."). It is clear from the amended complaint that Plaintiff is alleging defamation *per se*.

As a threshold matter, a defamation complaint must allege the time, place and manner of the false statement and identify to whom the false statement was made. *See Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 550 (S.D.N.Y. 2011). Here, Plaintiff does not specify to whom the allegedly false statements were made, where, or when they were made. Am. Compl. ¶ 48(A)–(D). His sworn affidavit provides little clarity, repeating that the statements were made "to staff and students at Marshall High School" during "fall of 2008." Tolbert Aff. ¶ 3. Likewise, Smith's statements regarding Plaintiff's unauthorized spending were made to "faculty and staff" and there is no mention as to when this occurred. Plaintiff has not submitted any evidentiary proof in admissible form showing that the statements were made, to whom they were made, or specifically when they were made. Despite an ample opportunity for discovery, there is no evidentiary support in the record from any individuals that Plaintiff claims to have heard each or any of the statements. On this basis alone, Plaintiff therefore cannot overcome Defendants' motion for summary judgment. *See, e.g., Ventimiglia v. Hustedt Chevrolet*, Civ. Action No. 05-4149, 2009 WL 803477, at *16 (E.D.N.Y. Mar.

25, 2009) (granting summary judgment on defamation claim where Plaintiff failed to put forth admissible evidence that the defamatory statement was made); *Schulman v. Cont'l Ins.*, 258 A.D.2d 639 (N.Y. App. Div. 2d Dep't 1999) (granting summary judgment where plaintiff "relied entirely on speculative hearsay and failed to adduce admissible evidence that the individual defendants published the defamatory statements.").

The Court therefore concludes that Plaintiff has failed to allege defamation *per se* and the second claim of the amended complaint is dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment, ECF No. 18, is granted, and the amended complaint, ECF No. 10, is dismissed in its entirety.

IT IS SO ORDERED.

Dated:   March 7, 2014
          Rochester, New York

                    ENTER:

                              /s/ Charles J. Siragusa
                              CHARLES J. SIRAGUSA
                              United States District Judge